Huckins Tool & Die, Inc. v. Commissioner.
Huckins Tool & Die, Inc. v. Commissioner
Docket No. 67308.
United States Tax Court
T.C. Memo 1959-190; 1959 Tax Ct. Memo LEXIS 57; 18 T.C.M. (CCH) 856; T.C.M. (RIA) 59190; October 13, 1959
*57 Held, a portion of the salaries paid by petitioner to each of its three executive officers, who were in control of the corporation, was excessive and unreasonable for their respective services for each of the years in question within the meaning of section 23(a)(1)(A) of the Code of 1939. Amount of excessive and unreasonable compensation determined. James F. Thornburg, Esq., 645 Associates Building, South Bend, Ind., C. J. Major, Esq., and John L. Carey, Esq., for the petitioner. Charles B. Norris, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, J: Respondent determined deficiencies in the income tax of petitioner as follows: Year
Amount
1951
$ 77,824.60
1952
64,933.37
1953
86,130.16
$228,888.13
The only issue for decision is whether or not the compensation paid by petitioner to each of its three officer-shareholders exceeded a reasonable amount for each of the years in question, and, if so, the amount of such excess. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Huckins Tool & Die, Inc., (hereinafter referred to as petitioner or the *58 corporation) was organized by James R. Huckins and Richard Krause as an Indiana corporation on August 22, 1937, under the name of K & H. Tool & Die Co. This name was changed to Huckins Tool & Die, Inc., in December 1939, when Richard Krause relinquished his interest in the business. Petitioner filed timely Federal income tax returns for its taxable years ending December 31, 1951, 1952, and 1953, with the director of internal revenue at Indianapolis, Indiana. Petitioner has an authorized capitalization of 1,000 shares of no par value stock. Ownership of the issued and outstanding voting shares of petitioner in the taxable years 1951 through 1953, inclusive, was as follows: James R. Huckins
501 shares
Robert J. Huckins
249 shares
Richard E. Huckins
249 shares
Cora R. Huckins
1 shares The above shareholders were also the board of directors of petitioner. During the years here involved, the following were the officers of petitioner: James R. Huckins
President
Robert J. Huckins
Secretary & Asst. Treasurer
Richard E. Huckins
Treasurer
In the taxable years under consideration, the plant of petitioner, and its principal place of business, *59 was located in South Bend, Indiana. From 1927 to 1943, petitioner operated under the direction of 3 and sometimes 4 executive officers. During the years under consideration, it operated under the direction of 3 officers: James, Robert, and Richard Huckins. During the years in question, the officers devoted their time and efforts exclusively to the business of petitioner. Petitioner is and was engaged in the business of conducting a tool and die shop which designs, builds, and sells high production tools, jigs, fixtures, gauges, dies, and special machinery. Petitioner makes either all, or parts of machines, and also equipment for machines and machinery which, in turn, produce and products. A shop of this character has no fixed or standard product and, accordingly, it is to be distinguished from the production facilities wherein end products are manufactured and assembled. The complexities of design and fabrication were such that highly skilled labor was required and technical skill was necessary to manufacture tools, dies, and fixtures, where tolerances must, in some instances, be held to a range of no greater than.0001 of an inch. On January 30, 1950, the board of directors *60 fixed the basic salary of James R. Huckins at thirty-six thousand dollars ($36,000), the basic salary of Robert J. Huckins at twenty-four thousand dollars ($24,000), and the basic salary of Richard E. Huckins at twenty-four thousand dollars ($24,000). The board of directors also provided for supplemental compensation in accord with the following resolution which was approved at the same time as follows: "RESOLVED that in addition to the salaries above provided, the officers be paid for services rendered to the Corporation during the year ended December 31, 1950, an amount equal to 30 per cent of the net proceeds of the Corporation for said year before deduction of Federal Income Taxes, said amount to be divided as follows: "James R. Huckins, President
3/7
Robert J. Huckins, Secretary
2/7
Richard E. Huckins, Treasurer
2/7" Similar resolutions were passed on January 29, 1951, January 28, 1952, and January 26, 1953. During the period 1941 to 1957, inclusive, the compensation paid petitioner's officers is broken down as follows: James R. Huckins, President
Year
Basic
Contingent
Total
1941
$24,780
$40,000
$64,780
1942
47,400
20,000
67,400
1943
52,000
1,200
53,200
1944
52,000
1,200
53,200
1945
52,000
1,400
53,400
1946
52,000
1,400
53,400
1947
36,000
0
36,000
1948
36,000
0
36,000
1949
36,000
0
36,000
1950
36,000
18,177
54,177
1951
36,000
37,999
73,999
1952
36,000
28,220
64,220
1953
36,000
41,795
77,795
1954
36,000
17,475
53,475
1955
36,000
8,603
44,603
1956
36,000
13,153
49,153
1957
36,000
0
36,000
Robert J. Huckins,
Secretary and Assistant Treasurer
1941
$20,038
$40,000
$60,038
1942
41,489
20,000
61,489
1943
45,500
1,700
47,200
1944
45,500
1,700
47,200
1945
45,500
1,875
47,375
1946
45,500
1,375
46,875
1947
24,000
0
24,000
1948
24,000
0
24,000
1949
$24,000
$ 0
$24,000
1950
24,000
12,118
36,118
1951
24,000
25,332
49,332
1952
24,000
18,813
42,813
1953
24,000
27,863
51,863
1954
24,000
11,650
35,650
1955
24,000
5,735
29,735
1956
24,000
8,768
32,768
1957
24,000
0
24,000
Richard E. Huckins, Treasurer *
1941
$ 7,913
$10,000
$17,913
1942
23,748
15,000
38,748
1943
26,000
300
26,300
1944
26,000
1,700
27,700
1945
26,000
1,800
27,800
1946
26,000
1,300
27,300
1947
21,000
0
21,000
1948
21,000
0
21,000
1949
24,000
0
24,000
1950
24,000
12,118
36,118
1951
24,000
25,332
49,332
1952
24,000
18,813
42,813
1953
24,000
27,863
51,863
1954
24,000
11,650
35,650
1955
24,000
5,735
29,735
1956
24,000
8,768
32,768
1957
24,000
0
24,000
Herman P. Wilson, Vice President
1941
$ 9,120
$22,500
$31,620
1942
15,680
15,000
30,680
*61 The type of plan on which the compensation was based, namely, a base salary plus a bonus or extra compensation based upon a share of profits is not unusual in industry in general nor in the tool and die business in particular. Such a plan had been in effect in petitioner's business for a long period of time, but the plan or formula for the years here in question began in the taxable year 1950. James R. Huckins was born in 1889 and began tool and die work at the age of 16 in Dayton, Ohio. He began and completed an apprenticeship course in tool and die work in Dayton. In addition, he completed a 2-year course in mathematics and higher mathematics and a 2-year course in design of special machines. James became what is known in the tool and die industry as a benchman or journeyman. He specialized in building tools, dies, jigs, fixtures and special machinery. He became foreman of the Old Cairo Tool & Die Co. of Dayton, Ohio, and subsequently became foreman of the McBarr-Mitchell Tool Company of Dayton. Later, he became manager of the Vulcan Tool Company in Dayton and served in this capacity for 4 years. In 1929, James came to South Bend, Indiana, *62 where he served as manager of the South Bend Tool & Die Company until 1937. This plant was and remains the largest tool and die plant in South Bend and one of the largest tool and die plants in the United States. At one time, James managed the Dayton plant, the Evansville plant, and the South Bend plant of that company. In 1937, James withdrew from the South Bend Tool & Die Company for the purpose of entering business on his own. At this time, he, together with Richard Krause, formed the K. & H. Tool and Die Co. In 1939, he took over complete ownership of the corporation and changed its name to Huckins Tool & Die, Inc.
During the years in question, James determined the over-all business policies of petitioner. In addition, from time to time, as circumstances required, he was active as an executive in the machine shop, in the designing room, and in selling, both on the road and in his office. Richard E. Huckins, one of James's sons, was born in 1919 and began work in the tool and die trade in 1937. He served a 4-year apprenticeship which involved 8,000 hours of training and bench work. Upon graduation from apprenticeship, he worked in the shop for 6 months during which time he *63 received his journeyman's card. Richard has held various positions with petitioner. He has served as purchasing agent, assistant foreman, shop superintendent and plant manager. During the years 1951, 1952, and 1953, he was shop superintendent in charge of an average production force of 72 men. During this time, he was primarily responsible for bidding on deliveries, for writing up all jobs, for ordering and purchasing all materials. He was also responsible for labor relations on the plant level and participated in the annual negotiation of the collective bargaining agreement with the union. During the years in question, he worked an average of more than 60 hours per week. During the years in question, there were usually 300 or 400 jobs pending in the shop. The vast majority of these jobs had to be written up, i.e., statements were made on a form sheet, indicating the way the job could be most economically performed, finding short cuts, ordering the necessary materials, and making any pertinent comments on the method of production. J. W. Mitchell was job foreman during the years in question and worked directly under Richard Huckins. Mitchell would alternate the estimating work *64 with Richard and would, in conjunction with Richard, write up the jobs in the plant. This write-up was done by both men not only during the work day but also in the evenings and on Sundays. Mitchell's salary during the years in issue ranged from $10,284 to $11,874. Richard was on the board of directors of petitioner and regularly attended directors' meetings. Robert J. Huckins, another son of James, was born in 1915 and entered the tool and die trade in 1934 upon graduation from high school. He served his apprenticeship with the South Bend Tool & Die Company and received his journeyman's card when he completed his apprenticeship. He then worked for 4 years building tools, dies, jigs, and fixtures. Robert devoted a considerable portion of his time during the years in question to estimating. The work constituted 75 to 90 per cent of his duties during the years under review. He was head of the sales department and was personally active in making sales. He made contacts in various cities, built up good will and developed customer relations. Robert was in charge of all affairs in connection with wage stabilization and supervised the office and accounting department, although petitioner *65 employed an office manager for the detailed work. Robert was also in charge of the design and engineering department during the years in question. This department employed 20 engineers and designers, among which was a supervisor of this section working directly under Robert whose annual salary ranged from $10,665 to $11,015 during the years in issue. Robert served on the negotiating committee for the employer's association. This committee negotiated with the local union on a collective basis with the other tool and die manufacturers in the area. This committee formulated policies in relation to negotiating contracts with the union regarding labor rates.
During the years here involved, 95 per cent of the work done by petitioner was procured on the basis of careful estimates and bids submitted by and under the direction of the executives here involved. In determining a bid price, an estimate was made in terms of the hours which the estimator believed would be necessary to complete the design and building of the tool. A separate estimate was required for each job. An important coordinating factor in sales in the years in question was, however, a very active demand for petitioner's *66 products due to Korean War conditions. In the course of its operation, petitioner received what is known as a "part print" from its customer. This "part print" consisted of a printed sketch or diagram of the end product which the customer wanted to receive. From this "part print," petitioner designed or built the tool or machine which made the end product. Some of petitioner's major accounts during the years 1951, 1952, and 1953, were: (a) General Motors
(b) International Harvester (c) Allison Engine (d) Allison Motors (e) John Deere Tractor, Dubuque, Iowa
(f) Collins Radio, Cedar Rapids, Iowa
(g) Giddings & Lewis Machine Tool, Fond du Lac, Wisconsin
(h) Gishalt Machine Tool, Madison, Wisconsin
During the years in question, the plant operated on 2 shifts and normally worked a 6-day week, although many times it operated 7 days a week. In addition, petitioner's officers worked many evenings in order to expedite the work of petitioner. Petitioner's customers also had problems of application which necessitated petitioner's executives going into the customer's plant and working with the customer to provide for such application from an engineering standpoint. *67 Petitioner had no pension plan, or definitive plant-wide profit sharing plan, or any other form of deferred compensation plan during the years 1951, 1952, and 1953, except a small group life insurance plan which included all the employees. Under this plan, each executive was insured, in the event of death, to the extent of $2,000. The following table discloses the average pay per employee, exclusive of the officers of petitioner: Average
Total Payroll
Average
Number of
Exclusive of
Pay per
Year
Employees
Officers
Employee
1951
108
$703,167
$6,511
1952
124
809,783
6,530
1953
111
745,777
6,719
1954
98
512,216
5,226
The total compensation earned by men in the shop who were under the direction and control of the officers of petitioner, together with their respective titles and job, are as follows: Years and Amounts
Name
Title
1951
1952
1953
William Wolfe
Sales Engineer
$10,280
$11,510
$12,800
J. W. Mitchell
Shop Foreman
10,284
11,173
11,874
K. F. McIntyre
Assistant Foreman
8,346
11,295
W. C. Waite
Assistant Foreman
11,271
11,265
M. Bennett
Supervisor of Design Room
10,665
11,015
10,977
H. Anderson
Boring Mill Operator
9,928
10,398
Wm. Reitz
Sales Engineer
8,780
9,985
12,850
*68 Petitioner's total gross sales and the sales which were subject to renegotiation proceedings for the years 1951 through 1954 were as follows: Year
Total Gross
Renegotiable
Sales
Sales
1951
$1,469,175
$467,852
1952
1,606.313
895,061
1953
1,690,583
376,835
1954
1,310,153
142,085
Petitioner filed renegotiation reports with the Renegotiation Board for the years 1953 and 1954. These reports were approved as filed. For the taxable years 1951 and 1952, petitioner is contesting the determinations of the Renegotiation Board, including the amounts and items subject to renegotiation. During the period 1941 to 1957, inclusive, petitioner's books and Federal income tax records reflect gross salaries, gross profits, net income before taxes, Federal income taxes paid, net income after taxes, officers' salaries paid, earned surplus, and net worth as follows: Earned
Net
Net
Federal
Net
Officers'
Surplus
Worth
Gross
Gross
Income
Income
Income
Salaries
End of
End of
Sales
Profit
Before
Tax Paid
After
Paid
Year
Year
Taxes
Taxes
1941
$ 639,883
$297,515
$ 77,417
$ 42,561
$34,856
$174,352
$ 34,281
$ 86,719
1942
833,501
403,616
145,102
116,081
29,021
198,317
77,035
127,035
1943
844,540
219,813
175,860
63,673
126,700
44,867
94,867
1944
655,222
98,972
71,728
27,244
128,100
69,923
119,923
1945
617,006
47,879
29,199
18,680
128,575
88,604
138,604
1946
714,311
63,280
24,046
39,234
127,575
27,837
177,837
1947
622,943
160,229
43,207
15,400
27,807
81,000
55,645
205,645
1948
667,524
179,522
50,236
19,090
31,146
81,000
86,791
236,791
1949
633,864
193,273
10,788
2,381
8,407
84,000
80,655
230,655
1950
966,502
256,049
98,968
44,979
53,989
126,414
134,644
284,644
1951
1,469,175
554,907
206,885
134,705
72,180
172,665
206,824
356,824
1952
1,606,313
524,826
153,645
102,181
51,464
149,848
258,288
408,288
1953
1,690,583
617,187
227,555
153,529
74,026
181,523
332,314
482,314
1954
1,310,153
383,772
95,146
43,976
51,170
124,777
382,424
532,424
1955
1,147,951
306,779
46,842
18,858
27,984
104,075
410,408
560,408
1956
1,486,016
339,078
71,761
31,815
39,946
114,690
433,151
583,151
1957
1,274,787
222,644
462
138
324
84,000
433,035
583,035
*69 The business activities of the tool and die industry are cyclical in nature and tend, over the years, to fluctuate widely. Petitioner was particularly busy in the years 1951 to 1953. The increase in business activities during these years was due in substantial measure to the Korean conflict. During these years petitioner did not find it necessary to actually engage in selling its services, as customers sought out petitioner in order for them to meet the requirements of the wartime economy. The increase in production and sales during this period, which was due in substantial measure to the Korean conflict, did not result in a commensurate increase in the duties and responsibilities of petitioner's officers although such increases in business activity did add, to some extent, additional burdens and responsibilities to their existing workload. The only cash dividend ever declared or paid by petitioner was in the amount of $30,000 in the year 1943. During the years in question, the efficiency of petitioner's management as compared with the tool and die industry, in general, was slightly above average. Respondent determined that the salaries paid to petitioner's executives were *70 unreasonable and excessive and disallowed the following amounts: Amounts
Amounts Dis-
Year
Claimed
allowed
1951
$172,665
$112,665.08
1952
149,848
89,848.14
1953
181,523
121,523.74 The effect of the foregoing was to allow compensation deductions in the amount of $60,000 to all three executives for each of said years without designating particular amounts as reasonable for any one of said executives. A portion of the compensation deducted by petitioner and paid to James, Robert, and Richard Huckins for each of the years 1951, 1952, and 1953, was in excess of reasonable. Reasonable compensation and compensation in excess of reasonable as to each of said executives for each of the years involved are as follows: James R. Huckins
In excess of
Year
Reasonable
reasonable
1951
$58,999
$15,000
1952
51,700
12,500
1953
62,295
15,500
Robert J. Huckins
1951
$39,332
$10,000
1952
34,313
8,500
1953
41,613
10,250
Richard E. Huckins
1951
$39,332
$10,000
1952
34,313
8,500
1953
41,613
10,250
Opinion Respondent allowed to petitioner corporation a total deduction of $60,000 for each of the taxable years *71 1951, 1952, and 1953, as salaries to the three Huckins, father and two sons, who were the chief executives, directors, officers, and owners of substantially all of the stock of petitioner. The salaries to said executives disallowed for the respective years totalled the following: 1951 - $112,665.08; 1952 - 89,848.14; 1953 - $121,523.74. The problem before us is to determine what is a reasonable allowance for salary or other compensation to each of the three executives for each of the years in question under the provisions of section 23(a)(1)(A) of the Code of 1939. The actual services performed by each of the three executives are summarized in our Findings of Fact, and need not be repeated here. Suffice it to say that each executive was thoroughly trained and experienced, possessed a high degree of intelligence and technical knowledge, worked skillfully and efficiently for long hours; rendered very valuable services to the petitioner; and was entitled to substantial compensation. We think it would serve no useful purpose to discuss each of the numerous contentions presented by the parties, all of which have been fully considered in conjunction with a careful examination of the *72 entire record. We have no doubt (a) that the deductions taken by petitioner representing compensation paid to each of its three executives for each of the years in question are in excess of reasonable, and (b) that the salary allowances determined by respondent are inadequate. We think it patent that the marked increases in sales, gross profits and net profits before taxes were due in substantial degree to Korean War conditions. Likewise, we think it clear that the compensation of the executives, geared largely to profits, reflected in substantial measure the fortuities of the war economy without commensurate increase in the duties and responsibilities of the executives or in the value of their services. To draw the line between what is reasonable and what is excessive is, of course, a difficult undertaking. We do not think it possible in this case to draw a precise line to the dollar. We come, therefore, to the point where we must use our judgment, after weighing all the evidence, to reconcile and integrate the elements material to our ultimate conclusions. Our Findings of Fact reflect our determinations. We implement them into our Opinion by reference, since there is no occasion *73 to repeat them. We need only add, for completeness, that the difference between our annual allowances and disallowances for each of the years in question is attributable to the fact that the salaries are in part based upon contingent compensation, and to the minor factor that the amounts disallowed are rounded off, since no more precise answer is practicable. Decision will be entered under Rule 50. Footnotes
*. Treasurer since July 15, 1941↩